**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| **SEVILLO FINE FOODS LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES OF AMERICA,**<br><br>**Defendant.** | **MEMORANDUM DECISION & ORDER GRANTING DEFENDANT'S SECOND PARTIAL MOTION TO DISMISS AND REQUEST FOR JUDICIAL NOTICE**<br><br>**Case No. 2:25-cv-00273-DBP**<br><br>**Magistrate Judge Dustin B. Pead** |

Before the Court is Defendant the United States' ("Defendant" or "United States") Second Partial Motion to Dismiss Plaintiff Sevillo Fine Foods' ("Plaintiff" or "Sevillo") Amended Complaint and Request for Judicial Notice.[1] Having considered the parties' briefing,[2] the allegations set forth in the Second Amended Complaint,[3] the government documents identified in the Second Amended Complaint[4] and the argument of counsel as presented on July

---

[1] ECF No. 54, United States' Second Motion to Dismiss for Failure to State a Claim; *see also* ECF No. 28, Notice of Consent. The parties in this case consented to United States Magistrate Judge Dustin B. Pead conducting all proceedings, including entry of final judgment. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; DUCivR 72-3.

[2] ECF No. 57, Sevillo's Opposition to Second Motion to Dismiss; ECF No. 58, United States' Reply to Second Motion to Dismiss.

[3] ECF No. 53, Sevillo's Second Amended Complaint.

[4] ECF No. 54-1, Cybersecurity and Infrastructure Security Agency's "Advisory Memorandum on Identification of Essential Critical Infrastructure Workers During Covid-19 Response"; ECF No. 54-2, United States Coast Guard's "Marine Safety Information Bulletin" dated March 27, 2020;

31, 2026,[5] the Court now rules as follows and grants the United States' partial motion for dismissal.

## I. BACKGROUND

### A. The Employee Retention Credit

Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") in March 2020 to provide financial assistance to those suffering economic harm from the COVID-19 pandemic.[6] The Act created several distinct relief programs, each with a different scope of beneficiary. Section 2301 created the Employee Retention Credit ("ERC"), a refundable credit against employment taxes intended to keep employees on the payroll during the COVID-19 pandemic.[7] The ERC is a "presumption out" statute, meaning that employers start outside the

---

ECF No. 54-3, Centers for Disease Control and Prevention's Interim Guidance for "Infrastructure Workers Who May Have Had Exposure to a Person with Suspected or Confirmed COVID-19"; ECF No. 54-4, Centers for Disease Control and Prevention's "Covid-19 Critical Infrastructure Sector Response Planning"; ECF No. 54-5, California Division of Occupational Safety and Health's Covid-19 Emergency Temporary Standards effective from November 30, 2020 to June 17, 2021; ECF No. 54-6, California Division of Occupational Safety and Health's Covid-19 Emergency Temporary Standards effective from June 17, 2021 to January 13, 2022; ECF No. 54-7, City of Long Beach's Safer At Home Order dated March 20, 2020; ECF No. 54-8, City of Long Beach's Press Release dated December 6, 2020; ECF No. 54-9, City of Long Beach's Press Release dated March 31, 2021; ECF No. 54-10, City of Long Beach's "Safer At Home Order For Control of Covid-19" dated June 15, 2021; ECF No. 57-1, California Division of Occupational Safety and Health's "Covid-19 Industry Guidance: Ports" dated July 29, 2020.

[5] ECF No. 61, Notice of Hearing on Motion; ECF No. 62, Minute Entry.

[6] Pub. L. No. 116-136, 134 Stat. 281 (2020).

[7] *South Delta Planning & Development District v. United States,* 2026 U.S. Dist. LEXIS 156805, at *4 (N.D. Miss. July 15, 2026); *Tapestry Senior Housing Management LLC v. United States,* 2026 U.S. Dist. LEXIS 140828, at *1-2 (D. Minn. June 25, 2026) (ERC was Congress' "attempt

scope of eligibility and then must show how they "satisfy applicable statutory definitions to get 'in' and qualify for the relief."[8]

Congress established two pathways for employers, in operation before the pandemic, to seek Employee Retention Credit eligibility.[9] First, under the Gross Receipts Test an employer is eligible if its receipts for a quarter fell below a specified percentage of receipts for the corresponding quarter of 2019.[10] Second, under the Suspension Test, an employer qualifies for the credit if:

> the operation of [its] trade or business . . . is fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID–19).[11]

As related to the pending motion to dismiss, the focus of the Court's inquiry is on Sevillo's Employee Retention Credit eligibility under the Suspension Test.

---

to provide specific and limited financial aid to businesses who experienced significant revenue declines or were forced to fully or partially suspend operations and to encourage businesses to avoid layoffs and furloughs because of COVID-19-related government orders.").

[8] *In re JSmith Civil LLC,* 674 B.R. 207, 213 (Bankr. E.D.N.C. 2025).

[9] Section 2301 was amended by the Taxpayer Certainty and Disaster Tax Relief Act of 2020 ("Relief Act"), enacted December 27, 2020. *See* Pub. L. No. 116-260, div. EE, §§ 206–207, 134 Stat. 1182 (2020). The credit was later codified, as amended, at 26 U.S.C. § 3134, which applies to wages paid after June 30, 2021. *See* 26 U.S.C. § 3134(n). None of the three quarters at issue here is governed by § 3134. Count One arises under § 2301 as originally enacted; Counts Two and Three arise under § 2301 as amended by the Relief Act. The operative language of the Suspension Test is identical across each version, and the Court's analysis is the same under either citation.

[10] CARES Act § 2301(c)(2)(B).

[11] CARES Act § 2301(c)(2)(A)(ii)(I).

**B. Procedural History**

This is the second time the Court considers whether Sevillo states a claim to the Employee Retention Credit under the Suspension Test. In March 2026, the Court dismissed Sevillo's Suspension Test allegations and identified with specificity what Plaintiff's First Amended Complaint lacked: the governmental orders relied upon, their operative provisions, facts showing that the Turkish tomato imported by Sevillo was indispensable to a non-nominal continuation of operations and a causal connection between a government order and suspension.[12] At that time, the Court did not reach the question as to the degree of causation required under the statute, but observed that the issue was novel and the caselaw scant.[13] The Court ultimately granted Sevillo leave to amend and Sevillo has now amended.[14]

Sevillo's Second Amended Complaint claims entitlement to the Employee Retention Credit for the third quarter of 2020 (Count One), the first quarter of 2021 (Count Two) and the second quarter of 2021 (Count Three).[15] Counts One and Two plead both the Gross Receipts Test and the Suspension Test. Count Three rests on the Suspension Test alone. Defendant's pending motion seeks dismissal of Sevillo's allegations that rely on the Suspension Test for its Employee Retention Credit eligibility.[16] The United States does not seek dismissal of the Plaintiff's allegations in Counts One and Two that invoke the alternative Gross Receipts Test.[17]

---

[12] ECF No. 52, Order Granting United States' Partial Motion to Dismiss.

[13] *Id.*

[14] *Id.*; ECF No. 52.

[15] ECF No. 53.

[16] ECF No. 54; CARES Act § 2301(c)(2)(A)(ii)(I).

[17] *Id.*; CARES Act § 2301(c)(2)(B).

### C. The Second Amended Complaint

The following allegations are taken from Sevillo's Second Amended Complaint.[18]

Sevillo is a specialty food manufacturer in Salt Lake City, Utah.[19] Treated tomato products, imported from a single supplier in Turkey, were included in approximately seventy-five percent (75%) of the products Sevillo sold and accounted for approximately seventy-five percent (75%) of its revenues in the latter half of 2019.[20] No alternate supplier of the tomato products existed because the Turkish vendor that Plaintiff relied upon employed a proprietary partial-dehydration process.[21] As a result, Sevillo could only obtain the tomato products by shipments from a specific Turkish vendor made through the Port of Long Beach, California.[22]

Starting in March 2020 and continuing through the relevant quarters, Sevillo alleges a number of governmental authorities, including the State of California, the California Division of Occupational Safety and Health ("Cal/OSHA"), Los Angeles County, the City of Long Beach and the City of Los Angeles, issued orders designed to address the protection of workers, businesses and state residents and to mitigate the spread of COVID-19 in the workplace.[23] Sevillo offers the following government documents, issued by the identified governmental authorities, as support for its Suspension Test Claims: guidance issued by the Cybersecurity and Infrastructure Security Agency, Marine Safety Information Bulletin 11-20 issued by the United States Coast Guard, interim guidance issued by the Centers for Disease Control and Prevention,

---

[18] ECF No. 53.

[19] *Id.* at ¶¶ 1, 10.

[20] *Id.* at ¶¶ 11, 55–57.

[21] *Id.* at ¶¶ 56–57.

[22] *Id.* at ¶ 58.

[23] *Id.* at ¶ 60.

the COVID-19 Emergency Temporary Standards promulgated by the California Division of Occupational Safety and Health, orders and press releases issued by the City of Long Beach and the California Department of Public Health's "COVID-19 Industry Guidance: Ports."[24]

Plaintiff asserts that compliance with these government documents caused the ports of Los Angeles and Long Beach to be understaffed and unable to operate at full capacity, leading to congestion; that the congestion delayed delivery of its tomato products; and, as a result thereof, Sevillo cancelled an unprecedented number of customer orders in the second quarter of 2021.[25]

Based on these disruptions, Sevillo filed Forms 941-X claiming entitlement to the Employee Retention Credit on the grounds that its business operations were "fully or partially suspended due to orders from governmental authorities" for the tax quarters ending September 30, 2020, March 31, 2021 and June 30, 2021.[26]

## II. LEGAL STANDARD

Rule 8(a)(2) requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[27] A motion to dismiss a pleading may be granted when the petition fails "to state a claim upon which relief can be granted."[28] To survive a motion

---

[24] *Id.* at ¶¶ 59–62; *see also* ECF No. 54-1; ECF No. 54-2; ECF No. 54-3; ECF No. 54-4; ECF No. 54-5; ECF No. 54-6; ECF No. 54-7; ECF No. 54-8; ECF No. 54-9; ECF No. 54-10; ECF No. 57-1.

[25] *Id.* at ¶¶ 59, 63–67. Sevillo alleges increased costs of packaging supplies, freight, offsite storage and direct supplies. *Id.* at ¶ 65. Sevillo also claims it retained approximately eighty-five (85) full-time employees throughout the quarters at issue. *Id.* at ¶ 13.

[26] *Id.* at ¶¶ 39–52. Plaintiff pleads gross receipts for the second, third, and fourth quarters of 2020 and for the corresponding quarters of 2019. All quarters remain pending.

[27] Fed. R. Civ. P. 8(a)(2).

[28] Fed. R. Civ. P. 12(b)(6).

under Rule 12(b)(6), a complaint must include sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.[29] Plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[30] In considering a motion to dismiss under Rule 12(b)(6), the Court "accepts all well-pleaded facts as true and view[s] them in the light most favorable to the plaintiff."[31]

Resolving a dispute over the meaning of a statute is a proper function of a motion under Rule 12(b)(6).[32] In doing so, this Court is mindful of the admonition that a court should be "especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel or extreme, since it is important that new theories be explored and assayed in the light of actual facts rather than a pleader's suppositions."[33]

When reviewing a 12(b)(6) motion to dismiss, the Court may consider outside documents that the complaint incorporates and matters that are subject to judicial notice.[34] Where a

---

[29] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S Ct. 1955, 167 L. Ed. 2d 929 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *Intermountain Electronics, Inc. v. United States*, 2021 U.S. Dist. LEXIS 133349, at *4 (D. Utah July 16, 2021).

[30] *Iqbal*, 556 U.S. at 679.

[31] *Jordan-Arapahoe, LLP v. Board of County Commissioners of Arapahoe,* 633 F.3d 1022, 1025 (10th Cir. 2011).

[32] *See, e.g., Hooper v. City of Tulsa*, 71 F.4th 1270, 1282 (10th Cir. 2023) (resolving a question of statutory interpretation on a 12(b)(6) motion for dismissal).

[33] *Logan v. Healthcare International Global Networks Ltd.,* 2013 U.S. Dist. LEXIS 167631, at *14 (E.D. Okla. Nov. 26, 2013).

[34] *See, e.g., Gee v. Pacheco,* 627 F.3d 1178, 1186 (10th Cir. 2010) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322, 127 S. Ct. 2399, 168 L. Ed. 2d 179 (2007)).

judicially noticed document contradicts an allegation of the complaint, the judicially noticed document controls.[35]

## III. JUDICIAL NOTICE

Sevillo identifies the documents on which its claim depends and the content of those documents is not in dispute. The United States asks the Court to take judicial notice of those documents referenced in the Second Amended Complaint and attached as exhibits.[36] Sevillo does not oppose Defendant's request.

The referenced documents are public records of governmental bodies, capable of accurate and ready determination from sources whose accuracy cannot reasonably be questioned, and courts routinely take judicial notice of COVID-19 public health orders.[37] Upon review, Defendant's unopposed request is granted and the Court takes judicial notice of Sevillo's exhibits.[38]

## IV. DISCUSSION

The parties agree to establish Employee Retention Credit eligibility under the Suspension Test Sevillo must show: (1) a full or partial suspension; (2) of the operation of the claimant's trade or business; (3) during the calendar quarter at issue; and (4) due to orders from an

---

[35] *Fuqua v. Santa Fe County Sheriff's Office,* 157 F.4th 1288, 1297–98 (10th Cir. 2025); *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997).

[36] *See* ECF No. 54-1; ECF No. 54-2; ECF No. 54-3; ECF No. 54-4; ECF No. 54-5; ECF No. 54-6; ECF No. 54-7; ECF No. 54-8; ECF No. 54-9; ECF No. 54-10, ECF No. 57-1.

[37] Fed. R. Evid. 201(b); *see, e.g.*, *Legacy Church, Inc. v. Kunkel*, 472 F. Supp. 3d 926, 1066 (D.N.M. 2020) (taking judicial notice of COVID-19 orders), *aff'd sub nom. Legacy Church, Inc. v. Collins*, 853 Fed. Appx. 316 (10th Cir. 2021) (unpublished).

[38] ECF No. 54-1; ECF No. 54-2; ECF No. 54-3; ECF No. 54-4; ECF No. 54-5; ECF No. 54-6; ECF No. 54-7; ECF No. 54-8; ECF No. 54-9; ECF No. 54-10, ECF No. 57-1.

appropriate governmental authority limiting commerce, travel, or group meetings because of COVID-19. [39] An employer who fails to establish any one of these elements is ineligible for the credit.[40] The parties further agree that Congress has not defined certain key terms in the statute, including "partial[,]" "suspension" or "orders from an appropriate governmental authority."[41]

The crux of the allegations on which Sevillo bases it eligibility are that its operations were partially suspended due to government orders that limited access through the port in which Plaintiff's critical supplies passed. Admittedly this is a novel argument, and claims for erroneously withheld Employee Retention Credits are "in some respects, new to the federal courts."[42] While recognizing the uniqueness of Plaintiff's arguments and the level of prudence required when considering novel claims, the Court now rules as follows and finds that Sevillo fails to state a plausible claim for relief under the Suspension Test because its Second Amended Complaint: (A) does not identify a qualifying government order that limits commerce; (B) does not plead causation; and (C) does not plead a full or partial suspension of its business.

---

[39] Some courts have folded the ERC test into three elements. Here, the Court includes a fourth element that makes explicit the quarter-by-quarter time frame that other courts have folded into the first three elements.

[40] *See Northeast Health Services LLC v. United States*, 181 Fed. Cl. 566, 574 (May 28, 2026); *I Health & Life Insurance Services v. United States*, 2026 U.S. Claims LEXIS 1858, at *17 (July 23, 2026) ("if the government identifies just one requirement that [the claimant] cannot meet, then [it] is ineligible").

[41] CARES Act § 2301(c)(2)(A)(ii)(I); *see JPM Restaurant v. United States,* 2026 U.S. Dist. LEXIS 40902, at *7 (E.D. Tenn. Feb. 27, 2026) (confirming the Act fails to define key terms).

[42] *Tapestry*, at *9.

### A. The Second Amended Complaint Does Not Identify A Qualifying Governmental Order Limiting Commerce

Under the Suspension Test, the judicially noticed government documents, attached as exhibits to Sevillo's Second Amended Complaint, do not constitute governmental "orders" that "limit[ ] commerce, travel or group meetings."[43] Consequently, Plaintiff's Second Amended Complaint fails to identify a qualifying government order from an appropriate governmental authority.

#### 1. The statute requires both an order and a limitation on commerce

The relevant statutory phrase under the Suspension Test is "orders from an appropriate governmental authority limiting commerce, travel, or group meetings . . . due to [COVID-19]."[44] Two distinct qualifications are embedded in this requirement: first, the directive must be an order; second, it must limit commerce, travel, or group meetings.

Regarding the first, a directive qualifies as an "order" when it carries enforcement authority or otherwise has the ability to compel a course of conduct through binding requirements or repercussions for noncompliance.[45] Relying on this definition, the Court finds that publications describing themselves as advisory, using permissive language, or imposing no consequence for noncompliance, do not constitute "orders" as contemplated under the statue.

As to the second requirement, because it is not defined this Court must give independent meaning to the phrase "limiting commerce, travel, or group meetings."[46] Importantly, the term

---

[43] CARES Act § 2301(c)(2)(A)(ii)(I).

[44] *Id.*

[45] *In re JSmith*, 674 B.R. at 214–15 ("a qualifying order is a compulsory directive issued by a government department that ha[s] responsibilities to limit commerce, travel, or group meeting due to COVID-19."); *accord Northeast Health*, 181 Fed. Cl. at 575–76.

[46] CARES ACT § 2301(c)(2)(A)(ii)(I).

"limiting" does not mean "prohibiting."[47] As such, a governmental order "limits" commerce, travel, or group meetings when it restricts the volume, scope, or occurrence of the activity—by capping capacity or throughput, closing a category of establishment or a line of business, prohibiting a class of transaction or gathering, or forbidding the activity outright.[48] Conversely, an order does *not* limit commerce when it prescribes the conditions under which the same activity may continue at whatever volume the operator is able to achieve.

This distinction is not one of this Court's own invention. In *JPM Restaurant v. United States* the court held that a masking mandate did not limit commerce, travel, or group meetings because the regulated activity—indoor dining—"could, and did, happen even with masking mandates."[49] Similarly, in *RAAM Construction v. United States* the court determined that workplace guidelines requiring the immediate exclusion of an infected individual "did not limit commerce, travel or group meetings" and were therefore not qualifying orders.[50] Applying this meaning here, none of the judicially noticed documents relied upon by Sevillo "limit" commerce.

---

[47] *See F.D.I.C. v. Meyer,* 510 U.S, 471, 476, 114 S. Ct. 996, 127 L. Ed. 2d 308 (1994) (where Congress does not expressly define a term, the court shall "construe a statutory term in accordance with its ordinary or natural meaning."); *see also Perrin v. United States,* 444 U.S. 37, 42, 100 S. Ct. 311, 62 L. Ed. 2d 199 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.").

[48] *Id.*

[49] *JPM Restaurant*, at *17 n.4.

[50] *RAAM Construction, Inc. v. United States*, 2026 U.S. Dist. LEXIS 140475, at *17 (C.D. Cal. June 23, 2026).

### 2. The advisory documents are not orders

At the outset, four of the judicially notice documents identified by Plaintiff are advisory and do not impose an obligation on anyone. These documents include: the Cybersecurity and Infrastructure Security Agency's Essential Critical Infrastructure Workforce Guidance, the Coast Guard's Marine Safety Information Bulletin 11-20, the California Department of Public Health's "COVID-19 Industry Guidance: Ports" and the Centers for Disease Control and Prevention publications.[51]

First, the Cybersecurity and Infrastructure Security Agency's "Essential Critical Infrastructure Workforce Guidance" describes itself as "advisory guidance" and states that its purpose is "[p]romoting the ability of [critical infrastructure] workers to continue to work during periods of community restriction."[52]

Second, the Coast Guard's "Marine Safety Information Bulletin 11-20" expressly states it is "advisory in nature and quarantine orders and their enforcement are ultimately up to State and local officials."[53] Its stated purpose is to "safeguard the continued operation of the [Marine Transportation System]."[54]

Next, the California Department of Public Health's "Covid 19 Industry Guidance: Ports" is styled as guidance that "is not exhaustive . . . nor is it a substitute for any existing safety and health-related regulatory requirements such as those of Cal/OSHA."[55]

---

[51] ECF No. 54-1; ECF No. 54-2, ECF No. 57-1; ECF No. 54-3.

[52] *Id.* at 3.

[53] ECF No. 54-2 at 1.

[54] *Id.*

[55] ECF No. 57-1 at 2.

Finally, the Centers for Disease Control and Prevention's publications are titled interim guidance and advise that "critical infrastructure workers may be permitted to continue working following potential exposure to a person with confirmed COVID-19."[56] While Sevillo argues the Centers for Disease Control's guidance is mandatory because it was incorporated by other directives, Plaintiff only cites to the documents themselves for such a proposition and guidance does not convert guidance into an enforceable order.[57]

**3. The Long Beach orders are orders, but they did not limit port commerce**

The City of Long Beach Safer At Home orders are compulsory and therefore the Court concludes that they meet the initial statutory requirement as qualifying orders. The Safer At Home orders were issued under California Health and Safety Code authority and a violation of the orders is chargeable as a misdemeanor, punishable by fine, imprisonment, or both.[58]

While the Long Beach orders meet the first requirement, they fail the second by exempting the very activity that Sevillo needs them to have restricted. For example, under the March 20, 2020 Long Beach order the stay-at-home requirement "does not apply to . . . Essential Infrastructure," and expressly lists "port operations" among the categories of essential infrastructure that is permitted to continue.[59] Indeed, the same order provides that "[a]ll Essential

---

[56] ECF No. 54-3; ECF No. 54-4 at 21; *see In re JSmith,* 674 B.R. at 217–18 (declining to treat Centers for Disease Control and Prevention and Occupational Safety and Health Administration guidance of this character as qualifying governmental orders.).

[57] ECF No. 57 at 14 n.10 (relying on the Cybersecurity and Infrastructure Security Agency guidance, ECF No. 54-1, and the California Department of Public Health port guidance, ECF No. 57-1, for the proposition that the Centers for Disease Control and Prevention guidance was incorporated into a governmental mandate).

[58] ECF No. 54-7 at 1, 7.

[59] *Id.* at 6.

Businesses are strongly encouraged to remain open."[60] The only condition attached is that essential infrastructure "carry out those services or that work in compliance with social distancing requirements, to the extent practicable."[61]

Thus, the Long Beach orders that allow an activity to continue to operate, subject to conditions on how the activity is to be performed, do not limit that activity within the meaning of the statute.

**4. The Cal/OSHA Emergency Temporary Standards did not limit commerce**

The Cal/OSHA Emergency Temporary Standards ("ETS") are compulsory orders and they also meet the first statutory requirement. As workplace safety regulations, the ETS require covered employers to adopt written COVID-19 prevention programs, screen employees for symptoms, maintain physical distancing, provide face coverings, improve ventilation, and exclude employees from the workplace who tested positive or were exposed for a defined period.[62]

As to the second condition, none of the ETS restrict port throughput, cap vessel processing, limit cargo movement, or require any reduction in operating capacity. Instead, the standards instruct potentially contagious individuals to stay at home and tell employers how to arrange the workplace for those employees who remain. Sevillo argues the ETS reduce the pool of available dockworkers and, because a facility with fewer workers cannot operate at the same

[60] *Id.* at 2.

[61] *Id.* at 6. The Second Amended Complaint essentially concedes this point when it pleads "a governmental order issued by the City of Long Beach allowed critical infrastructure to continue to operate only if certain safety measures, including face coverings and physical distancing, were followed at all times." *See* ECF No. 53 at ¶ 62.

[62] ECF No. 54-5; ECF No. 54-6; *see* Cal. Code Regs. tit. 8, §§ 3205–3205.2.

level, they actually reduce operational capacity.[63] But, as discussed above, an order that removes individual workers from the workplace does not amount to an order limiting the institution's commerce. The ETS do not tell the port to move less cargo or to reduce operations and, as a result, the ETS do not qualify as orders that limit commerce within the meaning of the statute.[64]

**5. The Cal/OSHA ETS did not exist during the quarter at issue in Count One**

There is an additional and independent defect as to Count One of Sevillo's Second Amended Complaint. Eligibility under the Suspension Test is assessed quarter by quarter.[65] The Cal/OSHA Emergency Temporary Standards took effect on November 30, 2020.[66] Count One seeks the credit for the quarter ending September 30, 2020.[67] The ETS were not in force during that quarter and the standards cannot have limited commerce during it.

Setting aside the ETS, the remaining documents in effect during the third quarter of 2020 are the Cybersecurity and Infrastructure Security Agency guidance, Marine Safety Information Bulletin 11-20, the Center for Disease Control and Prevention guidance, the California Department of Public Health DPH ports guidance, and the Long Beach orders.[68] As discussed

---

[63] ECF No. 57 at 13.

[64] *See RAAM Construction,* at *17; *see also In re JSmith,* 674 B.R. at 217-18 (the required quarantine of a crew member did "not rise to the level of a partial suspension of business operations," and "general pandemic conditions"—including "sick employees, quarantined employees, and supply chain issues"—to satisfy the limitation on commerce portion of the statute).

[65] *See I Health,* at *18 (cabining its analysis to "the calendar quarter for which the credit is determined . . . rather than the COVID-19 pandemic as a whole," and enumerating only those directives in effect during the quarter at issue).

[66] ECF No. 54-5; Cal. Code Regs. tit. 8, § 3205 (eff. Nov. 30, 2020).

[67] ECF No. 53 at ¶¶ 70-78.

[68] ECF No. 54-1; ECF No. 54-2; ECF No. 54-3; ECF No. 54-7; ECF No. 54-8; ECF No. 54-9;

above, the first four documents are not orders. The fifth document exempts port operations. As a result, Sevillo's Count One's Suspension Test allegations fail on the face of the judicially noticed documents which fail to qualify as government orders limiting commerce, travel, or group meetings because of COVID-19.

**6. Notice 2021-20**[69]

In March 2021, the Internal Revenue Service issued Notice 2021-20 ("Notice"), interpreting the Suspension Test through a series of questions and answers.[70] The IRS later extended that guidance to the first two quarters of 2021.[71]

Sevillo relies on a section of the Notice explaining that, where all, or all but a nominal portion, of an employer's operations may continue, but the operations are subject to modification due to a governmental order (for example, to satisfy distancing requirements) such modification is considered a partial suspension if it has more than a nominal effect.[72] Plaintiff reads this

---

ECF No. 54-10; ECF No. 57-1.

[69] While Notice 2021-20 may inform the Court's interpretation of the law, it is not the law. The Court interprets the statute de novo and may consult the agency's views for whatever power to persuade those views carry. *See Loper Bright Enterprises v. Raimondo,* 603 U.S. 369, 388, 394, 400, 144 S. Ct. 2244, 219 L. Ed. 2d 832 (2024); *see also Northeast Health,* 181 Fed. Cl. at 575 (courts may look to agency guidance as information but "may not delegate the task of statutory interpretation or otherwise defer to the re4levant agency's independent analysis.").

[70] I.R.S. Notice 2021-20, 2021-11 I.R.B. 922; I.R.S. Notice 2021-23, 2021-16 I.R.B. 1113.

[71] *Id.*

[72] ECF No. 29-3, I.R.S. Notice 2021-20, Q/A 11, 17–18 ("Q: If a governmental order requires an employer to close its workplace for certain purposes, but the workplace may remain operational for other limited purposes, is the employer considered to have a suspension of operations due to the governmental order? A: If an employer's workplace is closed due to a government order for certain purposes, but the employer's workplace may remain open for other limited purposes, the

section to mean that safety modifications are themselves commerce-limiting orders. The Court, however, does not find the Notice to bear such weight. Rather, the Court interprets the provision to answer a question of magnitude, not a question of threshold.

More specifically, the referenced Notice provision presupposes a qualifying governmental order that limits commerce and applies to the claimant's own operations and then goes on to question whether the modification that the order required had more than a nominal effect on those operations. The provision does not convert a condition on the manner of performance into an order limiting commerce, nor does it permit a claimant to borrow a third party's modification and treat it as a suspension of its own business.

Relying on the Notice, Sevillo further contends that if a modification can be a suspension, then the requirement to modify must itself be an order. While Sevillo's premise is correct, Plaintiff's conclusion does not follow. Indeed, while the requirement to modify must come from an order, it must come from an order limiting commerce as to the claimant. The modification provision assumes that predicate; it does not supply it.

**7. *RAAM Construction* does not compel a different result**

Sevillo looks to *RAAM Construction v. United States* for several propositions, including its claim that a Safer At Home order, requiring isolation and quarantine, qualifies under the statute as a governmental order.[73] The Court considers *RAAM Construction* carefully and concludes the case does not aid Sevillo's arguments for three main reasons. First, *RAAM Construction* held that the Los Angeles County COVID-19 workplace guidelines—the analogue

---

employer's operations would be considered to be 'partially suspended' if, under the facts and circumstances, the operations that are closed are more than a nominal portion of its business operations and cannot be performed remotely in a comparable manner.").

[73] *RAAM Construction,* at *17-18.

of the Cal/OSHA Emergency Temporary Standards relevant here—were not qualifying orders precisely because they did not limit commerce, travel, or group meetings.[74] Thus, on the document type that carries Sevillo's theory, *RAAM Construction* is positioned with the United States.

Second, the claimant in *RAAM Construction* was a construction company operating in Los Angeles County and subject to the orders Los Angeles County invoked. Here, Sevillo is a Utah manufacturer who is subject to none of them. This distinction is not incidental. It is the difference between an order that reaches the claimant and one that does not.[75]

Third, and most importantly, *RAAM Construction*'s allocation of the essential-business point to causation rather than order status does not change the outcome; it relocates it.[76] If the essential-infrastructure exemption bears on whether the identified orders were orders at all, then the Long Beach orders are not qualifying orders as to port operations and Sevillo's argument fails. If instead, the exemption bears on causation then Sevillo must show that orders, which designated port operations essential and directed that operations continue, proximately caused a suspension of its business in Utah. Sevillo has not done so and *RAAM Construction* does not support Sevillo's claims.

**8. Conclusion**

For the reasons stated, none of the documents identified in Plaintiff's Second Amended Complaint qualify as an order from an appropriate government authority that limits commerce,

---

[74] *Id.* at *16.

[75] *Id.*

[76] *Id.* at *17 (concluding the issue of whether "Plaintiff was an essential business speaks to the causation requirement between the government orders and Plaintiff's business operations" and not to whether the documents were themselves orders as defined by the statute).

travel, or group meetings within the meaning of § 2301(c)(2)(A)(ii)(I). The majority of the judicially noticed documents are not "orders" and those judicially noticed documents that do qualify as "orders" did not limit commerce. This conclusion stands as an independent ground on which the Court grants the United States' partial motion to dismiss Sevillo's Suspension Test claims for failure to state a claim.

## B. The Second Amended Complaint Does Not Plead Causation

In the alternative, even assuming Sevillo had identified a compulsory order limiting commerce, Plaintiff's Suspension Test based claims still fail because there is no legally sufficient causal connection between a governmental order and Sevillo's alleged operational suspension. In considering this issue, the Court turns to the question of whether the Suspension Test's "due to" provision requires a claimant to show that a qualifying governmental order was both the factual and the proximate cause of the claimed suspension. The Court concludes that the Suspension Test requires both factual and proximate cause and for this additional reason Sevillo's Second Amended Complaint fails to state a claim.

### 1. Ordinary meaning is the starting point

The statute does not define "due to" or describe the degree of causation required for a claimant to establish ERC eligibility. Sevillo asserts that only but-for causation is required under the statute.[77] But for causation is established "whenever a particular outcome would not have happened 'but for' the purported cause."[78] The United States, on the other hand, contends the phrase "due to" requires "both factual and proximate causation."[79]

---

[77] ECF No. 57 at 15-20.

[78] *Bostock,* 590 U.S. at 656.

[79] *See Lexmark International Inc. v. Static Control Components Inc.,* 572 U.S. 118, 133, 134 S. Ct. 1377, 188 L. Ed. 2d 392 ("the proximate cause requirement generally bars suits for alleged

When interpreting undefined statutory terms, the terms must be construed according to their "ordinary, contemporary, and common meaning."[80] The parties agree that the term "due to" ordinarily means "because of," and the term "because of" imports but-for causation. The remaining disagreement is whether but-for is all the statute requires.[81]

**2. The authorities Sevillo cites establish a floor, not a ceiling**

In each of the Supreme Court cases relied upon by Sevillo, the Court was presented with the choice between but-for causation and *something weaker*: a motivating factor, a contributing factor, or a substantial factor.[82] In none of the cases was the Court asked whether proximate

harm that is 'too remote' from the defendant's unlawful conduct."); *see also JPM Restaurant,* at *13.

[80] *Southwest Airlines Co. v. Saxon,* 596 U.S. 450, 455, 142 S. Ct. 1783, 213 L. Ed. 2d 27 (2002) (internal citation and quotation omitted).

[81] *See U.S. Postal Service v. Postal Regulatory Commission,* 640 F. 3d 1263, 1268 (D.C. Cir. 2011) (quoting *Kimber v. Thiokol Corporation,* 196 F.3d 1092, 1100 (10th Cir. 1999) ("[T]he phrase 'due to' is ambiguous" because it "has been given a broad variety of meanings in the law ranging from sole and proximate cause at one of the spectrum to contributing cause at the other.")).

[82] *See Bostock v. Clayton County*, 590 U.S. 644, 656, 140 S. Ct. 1731, 207 L. Ed. 2d 218 (2020); *University of Texas Southwestern Medical Center. v. Nassar*, 570 U.S. 338, 346–47, 360, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013) (defining but for causation as "the 'simple' and 'traditional' standard"); *Gross v. FBL Financial Services Inc.*, 557 U.S. 167, 176–78, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009); *Safeco Insurance Co. of America v. Burr*, 551 U.S. 47, 63–64 & n.14, 127 S. Ct. 2201, 167 L. Ed. 2d 1045 (2007); *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 773, 135 S. Ct. 2028, 192 L. Ed. 2d 35 (2015); *Burrage v. United States*, 571 U.S. 204, 210–14, 134 S. Ct. 881, 187 L. Ed. 2d 715 (2014).

cause—a higher standard—was also required.[83] Structurally, proximate cause does not appear in any of Sevillo's cases because they all involve direct two-party relationships—employer and employee, insurer and consumer—in which no intervening actor stands between the conduct and the injury. Such is not the case here and proximate cause is the doctrine that applies in order to limit liability across an extended chain of causation.[84]

**3. The structure of the CARES Act confirms the reading**

Congress enacted two distinct pathways for pre-pandemic employers to obtain relief. First, the Gross Receipts Test is a mathematically based evaluation that captures indirect economic harm without regard to whether any order reached the claimant.[85] Distinguishing itself from the Gross Receipts Test, the Suspension Test reaches employers whose operations were suspended by orders that limit commerce.[86]

---

[83] Plaintiff's own briefing describes *Burrage* as holding that but-for causation is "the minimum requirement for a finding of causation under the law." *See*, ECF No. 57 at 16 (citing *Burrage*, 571 U.S. at 211). A minimum is a floor.

[84] The Supreme Court has held that a statutory cause of action is presumptively limited to plaintiffs whose injuries were proximately caused by the statutory violation and has applied that presumption to undefined causal language. *See Lexmark* 572 U.S. at 132–34 (it is a "well established principle of [the common] law that in all cases of loss, we are to attribute it to the proximate cause, and not to any remote cause.") (quotation and citation omitted); *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268, 112 S. Ct. 1311, 117 L. Ed. 2d 532 (1992) (proximate cause demands "some direct relation between the injury asserted and the injurious conduct alleged."); *Bank of America Corp. v. City of Miami*, 581 U.S. 189, 202, 197 L. Ed. 2d 678, 137 S. Ct. 1296 (2017); *Hemi Group., LLC v. City of New York*, 559 U.S. 1, 9, 130 S. Ct. 983, 175 L. Ed. 2d 943 (2010).

[85] CARES Act § 2301(c)(2)(B).

[86] CARES Act § 2301(c)(2)(A)(ii)(I).

Upon review of both tests, if "due to" was, as Sevillo suggests, interpreted as only requiring but-for causation, then it follows that the Suspension Test would reach every employer whose business was affected by any consequence, however remote, of any pandemic-era order. Simply put, the reach of the test would encompass nearly every employer in the country. Under the broad application but-for causation carries, the Gross Receipts Test would serve no independent function and absent a proximate cause requirement the two test pathways collapse into "concentric circles"[87] and risk "turning the ERC into a presumption-in statute."[88]

**4. The weight of authority in this context**

While legal decisions construing the Suspension Test are not unanimous, the majority of courts require proximate causation and this Court finds the majority approach sagacious and well-reasoned.[89]

---

[87] *Northeast Health*, 181 Fed. Cl. at 580 (without proximate cause "the universe of employers that qualify for the suspension-of-business prong would envelope the universe of employers that qualify for the decline-in-receipts prong.").

[88] *JPM Restaurant*, at *12; *see also Clevland v. Mayorkas,* 762 F. Supp. 3d 1023, 1031 (E.D. Wash. Jan. 10, 2025) (citing *Shoner v. Carrier Corp.*, 30 F.4th 1144, 1149 (9th Cir. 2022) (the canon against superfluidity "guides [the Court] to infer that Congress did not intend to make any portion of a statute superfluous.") (internal quotation and citation omitted)).

[89] *See generally In re JSmith,* 675 B.R. at 215 (suspension test is satisfied only where "the reason [the claimant] stopped operating was that the governmental mandate directly required it."); *JPM Restaurant,* at *13 (holding "due to" requires both factual and proximate causation); *Northeast Health,* 181 Fed. Cl. at 580 ("context requires proximate causation"); *Sundancer Pools, Inc. v. United States*, 2026 U.S. LEXIS 1510, at *16 (June 23, 2026) (phrase "due to" requires showing that "a qualifying governmental order was both the factual and proximate cause of a full or partial suspension."); *I Health,* at *23 (suspension was both factually and proximately caused by the qualifying order)s*;* *RAAM Construction,* at *26 ("to demonstrate causation for purposes of

In support of its position Sevillo points to *RAAM Construction v. United States* where the court imposed but-for causation, concluding that a qualifying governmental order "must be the but-for cause" of the full or partial suspension of an entity's operations.[90] Yet the court's formulation in that case only states a necessary condition, it does not address whether but-for causation is also sufficient. The court had no occasion to reach that question because the plaintiff failed at the threshold when it "submitted no evidence of a causal chain" between any order and any disruption of its operations.[91] As a result, the Court does not interpret *RAAM Construction* as rejecting a proximate cause requirement or finding that proximate causation is unnecessary. Rather the court simply determined that but-for causation was required, and that it was absent.[92]

**5. *Tri-State Memorial Hospital* and *Titan Mutual Lending* are distinguishable**

Two decisions are outliers in the proximate cause analysis. In both *Tri-State Memorial Hospital v. United States* and *Titan Mutual Lending Inc. v. United States*, the courts determined that "due to" requires but-for causation and nothing more.[93] This Court distinguishes both cases and, for the reasons given, follows the majority approach to the causation requirement.

---

the ERC, the government order must be the "but-for" cause for the full or partial suspension of an entity's operations.").

[90] *RAAM Construction,* at *26.

[91] *Id.* at *28-29.

[92] Sevillo also argues that the proximate cause discussions in *JPM Restaurant v. United States* and *In re JSmith Civil LLC* are dicta, because both cases involved a complete failure of causation evidence. The Court does not agree. A determination does not become dictum merely because the court could have reached the same result on another ground. *See Woods v. Interstate Realty Co.*, 337 U.S. 535, 537, 69 S. Ct. 1235, 93 L. Ed. 1524 (1949) ("[W]here a decision rests on two or more grounds, none can be relegated to the category of obiter dictum.").

[93] *Tri-State Memorial Hospital v. United States*, 2026 U.S. Dist. LEXIS 118332, at *20 (E. D. Wash. May 28, 2026) ("the Court recognizes that 'due to' requires 'but-for' causation"); *Titan*

In *Tri-State Memorial Hospital* the court held that "due to" requires only but-for causation reasoning that incorporation of a proximate cause requirement would "improperly adds words into the ERC statute."[94] *Tri State Memorial Hospital* is one of two decisions squarely supporting Sevillo's position on this issue, and the Court considers it with care. However, for the reasons set forth below, this Court declines to follow it.

**a. The authorities on which *Tri-State* rests do not establish that but-for causation is the outer limit of an undefined causal term**

With respect to its holding on causation, *Tri-State Memorial Hospital* relies on three decisions: *Gross v. FBL Financial Services*, *Burrage v. United States*, and *Thomas v. CalPortland Co*.[95] In both *Gross* and *Burrage* the court chose between but-for causation and a weaker standard, and in neither case was the court asked whether proximate causation is an additional requirement. Likewise, in *Thomas* the court only addressed whether but-for cause is required for a discrimination claim under the Miner's Act, instead of a motivating factor—proximate cause was not at issue.[96] Authorities that fix a floor do not fix the ceiling and by setting a floor these cases do not clearly establish that the statute only requires but for causation.

---

*Mutual Lending, Inc. v. United States*, 2026 U.S. Dist. LEXIS 173676, at *20 (C.D. Cal. Aug. 3, 2026) ("the Court interprets the phrase 'due to' as it would 'because of,' as requiring but-for causation.").

[94] *Id*. at *20.

[95] *Id.* (citing *Gross*, 557 U.S. at 176; *Burrage*, 571 U.S. at 216; *Thomas v. CalPortland Co.*, 993 F.3d 1204, 1209 (9th Cir. 2021)); *see id.* (invoking *Abercrombie & Fitch Stores*, 575 U.S. at 774, for the proposition that an interpretation should not "add words to the law to produce what is thought to be a desirable result.").

[96] *Thomas,* 993 F.3d at 1209–10.

**b. The reasoning that a proximate cause requirement "improperly adds words" proves too much**

Proximate cause is rarely stated in statutory text. Typically, it is a background principle that absent contrary indication courts presume into causation.[97] As such, the Court does not adopt *Tri State's* conclusion that finding proximate cause improperly adds words to the statue.

Two additional observations. First, *Tri-State Memorial Hospital* rejected the superfluity argument, reasoning that under but for causation the Gross Receipts Test would still retain independent significance because an employer may be "economically affected without any partial or full suspension of trade or business operations due to a government order."[98] Yet that answer responds to a different concern than the one presented in this case. The question here is whether a Suspension Test requiring only but-for causation would reach every employer the Gross Receipts Test reaches thereby leaving the quantitative pathway with no independent function. Second, on the same day *Tri-State Memorial Hospital* was issued, *Northeast Health v. United States* issued and reached the opposite conclusion. The *Northeast Health* court concluded that context requires proximate causation lest the two prongs of § 2301(c)(2)(A) become "concentric circles."[99] Where two courts divide, this Court follows the analysis it finds more reasonable and complete.

---

[97] This is how the Supreme Court read "by reason of" in RICO, *see Holmes*, 503 U.S. at 268; *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457–58, 126 S. Ct. 1991, 164 L. Ed. 2d 720 (2006); *see also Hemi Group,* 559 U.S. at 1, the Lanham Act's casual element, *see Lexmark*, 572 U.S. at 139, and the Fair Housing Act, *see Bank of America Corp v. City of Miami*, 581 U.S. 189, 201-202, 197 L. Ed. 2d 678, 137 S. Ct. 1296 (2017).

[98] *Tri State Memorial*, at *14.

[99] *Northeast Health*, 181 Fed. Cl. at 580.

### 6. ***Titan Mutual Lending* does not persuade, and its disposition is instructive**

The *Titan Mutual Lending* court also held that "due to" imports only but-for causation and drew its reasoning from the ordinary meaning of the term "because of".[100] Yet similar to *Tri-State Memorial Hospital, Titan Mutual Lending* did not address the proximate causation presumptions applied in other cases.[101] Further, what *Titan Mutual Lending* did with its own standard is instructive. After adopting Plaintiff's construction of the terms "partial suspension" and "due to[,]" the court nonetheless entered judgment in favor of the United States determining that Plaintiff failed to show a partial suspension of its operations due to any qualifying order.[102]

---

[100] *Titan Mutual,* at *20 ("The Supreme Court has held that 'the ordinary meaning of because of' is 'by reason of' or 'on account of'"); *see Bostock*, 590 U.S. at 656; *Nassar*, 570 U.S. at 346-47; *Burrage*, 571 U.S. at 210-14.

[101] *Lexmark,* 572 U.S. at 139; *Holmes*, 503 U.S. 258.

[102] *Titan Mutual,* at *24-29.

**7. The decisions declining to dismiss ERC claims at the pleading stage are not to the contrary**

Sevillo relies on a line of decisions denying motions to dismiss Employee Retention Credit claims.[103] In each case, the respective court determined that plaintiff's complaint did not need to identify the particular governmental orders on which the plaintiff's ERC claim rested.[104]

Those decisions, however, do not reach the questions presented here. Sevillo has already identified its orders and the Court has taken judicial notice of them.[105] What remains at issue is whether the identified documents are orders limiting commerce. This is a question of law answered by a review of the operative text, and it is a question which none of the courts identified by Plaintiff had an occasion to reach.

**8. The chain Sevillo pleads is too attenuated as a matter of law**

Proximate causation asks whether the connection between the order and the claimed suspension is direct, rather than one linked through a series of intervening steps and independent

---

[103] *See Plastic Film, LLC v. United States*, 2026 U.S. Dist. LEXIS 9908, at *8 (S.D. Miss. Jan. 20, 2026) ("Although the Complaint does not identify a specific governmental order, there is no statutory, regulatory, or binding precedent requiring such specificity at the pleading stage."); *Region IV Mental Health Servs. v. United States*, 2026 U.S. Dist. LEXIS 147241, at *15 (N.D. Miss. July 1, 2026) ("[Plaintiff] is not required to plead with specificity the government orders that caused its alleged suspensions at this stage. . . ."); *South Delta,* at *10-11 ("[w]hether the referenced orders ultimately substantiate [Plaintiff's] eligibility for the credit presents a fact-intensive issue appropriately addressed through discovery or at summary judgment—and not a motion to dismiss.") (internal citation and quotation omitted).

[104] *Id.*

[105] *See supra* p. 8.

actors.[106] Sevillo indicates the point in the chain where the governmental order caused the suspension is the Port of Long Beach.[107] Thus, taking the Second Amended Complaint's own allegations, the causal chain alleged by Plaintiff is as follows:

1. Governmental authorities imposed workplace safety requirements applicable to California employers, including distancing and the exclusion of infected or exposed individuals.[108]
2. Some dockworkers at the ports of Los Angeles and Long Beach were consequently absent, and staffing was reduced.[109]
3. The ports became congested and could not process cargo at their ordinary rate.[110]
4. Containers carrying tomato products shipped by independent ocean carriers from a Turkish vendor were not processed on the ordinary schedule.[111]
5. Sevillo did not receive the tomato products when expected at its facility in Salt Lake City.[112]
6. Sevillo's production lines requiring that ingredient did not run, and it cancelled customer orders.[113]

---

[106] *Anza*, 547 U.S. at 457–58; *Lexmark*, 572 U.S. at 134 n.6 ("If a plaintiff's allegations, taken as true, are insufficient to establish proximate causation, then the complaint must be dismissed. . .").

[107] ECF No. 53 at ¶ 59.

[108] *Id.* at ¶¶ 60–62.

[109] *Id.* at ¶ 63.

[110] *Id.* at ¶¶ 59, 63.

[111] *Id.* at ¶ 64.

[112] *Id.*

[113] *Id.* at ¶¶ 66–67.

Problematically, each step in Sevillo's chain introduces an actor whom Plaintiff does not control and whose conduct the identified orders did not direct. The chain crosses international borders, traverses a third-party marine terminal, and depends on the shipping decisions of independent carriers.[114] Each link adds distance and independent intervening actors that sever Plaintiff's chain of causation. Under proximate cause, Sevillo's chain is fatally attenuated.

Sevillo argues the distance and the actors are not intervening causes because they are aspects of the ordinary functioning of a supply chain and the sequence is foreseeable---an order keeping workers home foreseeably slows a shipping terminal, and a slowed terminal foreseeably delays goods.[115] Yet foreseeability is only a necessary condition of proximate causation, not a sufficient one and treating it as sufficient is what allows for a limitless but-for reading that ultimately consumes the Gross Receipts Test.

**9. The supply chain pathway does not reach this case**

Notice 2021-20 recognizes one extension of the causal chain for a downstream employer.[116] Under the Notice, an employer may be considered to have a suspension where its suppliers are unable to deliver critical goods or materials due to a governmental order that causes the supplier to suspend its operations and where the employer is unable to obtain the goods

[114] *See JPM Restaurant,* at *26 (finding a three-step chain "too attenuated" to meet the definition of "due to" under the Act).

[115] ECF No. 57 at 13.

[116] ECF No. 29-3.

"from an alternate supplier."[117] This provision permits the downstream employer to stand in the position of a suspended supplier.[118]

However, Sevillo cannot satisfy that pathway on either theory of who its supplier was. First, if the supplier is the Turkish vendor—as Plaintiff asserts in the Second Amended Complaint, describing the treated tomato products as a "critical raw ingredient" obtainable from that vendor alone[119]—then no order suspended it. The Second Amended Complaint does not allege that any governmental order caused the Turkish vendor to cease or reduce production. To the contrary, the complaint alleges the vendor produced the goods, the goods were shipped and the goods simply arrived late.

Second, if the supplier is the Port of Long Beach, Sevillo has not pleaded the necessary elements. The provision conditions relief on the employer's inability to obtain the goods from a supplier or an alternate supplier. While Sevillo performed that analysis for the tomato, it

---

[117] I.R.S. Notice 2021-20, § III.D, Q/A 12 ("Q: If a governmental order causes the suppliers to a business to suspend their operations, is the business considered to have a suspension of operations due to a governmental order? A: An employer may be considered to have a full or partial suspension of operations due to a governmental order if, under the facts and circumstances, the business's suppliers are unable to make deliveries of critical goods or materials due to a governmental order that causes the supplier to suspend its operations. If the facts and circumstances indicate that the business's operations are fully or partially suspended as a result of the inability to obtain critical goods or materials from its suppliers because they were required to suspend operations, then the business would be considered an eligible employer for calendar quarters during which its operations are fully or partially suspended and may be eligible to receive the employee retention credit.").

[118] *Id.*

[119] ECF No. 53 at ¶¶ 56–57, 66.

performed no such analysis for the port.[120] Plaintiff's Second Amended Complaint does not allege there was no alternate port, carrier, or routing available. Furthermore, the port was not suspended but was instead designated essential infrastructure and directed to continue operating.

Sevillo argues there is no logical distinction between a good that cannot be made and a good that cannot be moved. But Sevillo does not plead the Port of Long Beach was closed, and the Court does not decide that question. What Sevillo pleads is a channel that was ordered to remain open and that was congested. But congestion is not suspension, and the distinction between them is the limiting principle the statute supplies: the chain may be extended by one link, to a supplier whose own operations a qualifying order suspended, and no further.

The consequence of the contrary rule confirms it. Presumably, nearly every imported good entering the United States in 2020 and 2021 moved through a congested port. If congestion at a transit channel satisfies the Suspension Test, then every importer in the country satisfies it, and the Gross Receipts Test—the mathematical pathway Congress designed for precisely this kind of economic injury—becomes surplusage.

**10. The claim fails under a but-for standard as well**

Even if Congress did not foresee a proximate cause requirement, Sevillo's claim also fails under a but-for causation standard. But-for causation requires that the suspension would not have occurred absent the qualifying order. But, as discussed above, Sevillo has not identified any qualifying order.[121] An order that did not limit port commerce cannot be the but-for cause of a

---

[120] *Id.* at ¶ 57.

[121] *See supra* p. 10-19.

reduction in port throughput and an order that never reached Sevillo or its Turkish vendor cannot be the but-for cause of a stoppage in Utah.

Taking it a step further, even assuming that each document identified by Plaintiff actually qualified as an order limiting commerce, the result still does not change. Sevillo alleges the ports became congested; it does not allege facts from which congestion may be attributed to the identified orders rather than to surging import volume, worker illness and absence irrespective of any exclusion requirement, equipment and chassis shortages, or the routing decisions of independent carriers. Where the pleaded facts are as consistent with causes the orders did not produce as with the orders themselves, but-for causation has not been pleaded.

*Titan Mutual Lending v. United States* illustrates this point from the claimant favorable side of the divide. In that case, the court adopted but-for causation along with a broad definition of the term "partial suspension," but still entered judgment for the United States.[122] In doing so, the court concluded that "the immediate cause" of the claimant's reduced sales "was the purchasing decisions of secondary market investors," and such decisions were "based on perceived economic risk are market responses, not operational suspensions caused by governmental orders."[123] Here port congestion is a phenomenon of the same order: the aggregate consequence of many independent actors' responses to pandemic conditions, not the operation of any order imposed upon Sevillo's business.

Similarly, in *N.E. Health v. United States* the court applied the same reasoning to an agency's own slowdown. The claimant in *N.E. Health* attributed its inability to open new clinics

---

[122] *Titan Mutual,* at *20.

[123] *Id.* at *28.

to the state health department's suspension of in-person inspections.[124] The court rejected that theory because claimant could not point to, and the court could not identify, any provision in a qualifying order that required the agency to suspend or limit those inspections. On those facts the court held "the identified correlation is not evidence of causation."[125]

Sevillo's theory here is the same in structure, but weaker in application. Plaintiff attributes a third party's operational slowdown to orders that nowhere directed the slowdown, and the third party is not the claimant.

## C. The Second Amended Complaint Does Not Plead A Full Or Partial Suspension

The third reason for which Sevillo does not meet the requirements of the Suspension Test is independent of the first two. Under the Suspension Test, employers may qualify for an Employee Retention Credit if they suffered a full or partial suspension of their trade or business. Even assuming a qualifying order *and* a sufficient causal connection, Sevillo has not pleaded a full or partial suspension.

### 1. The Standard

Similar to the other terms, Section 2301 of the CARES Act does not define "fully or partially suspended" and the Court must discern its meaning by initially looking to the plain language of the term.[126] Under the plain language, "suspension" is defined as "[t]he act of temporarily delaying, interrupting, or terminating something[,]"[127] and "partial" means "[n]ot complete; of, relating to, or involving only a part rather than the whole."[128] The verbs defining

---

[124] *Northeast Health,* 181 Fed. Cl. at 571.

[125] *Id.* at 583.

[126] *See Loper Bright*, 603 U.S. at 400.

[127] Suspension, Black's Law Dictionary (12th ed. 2024).

[128] Partial, Black's Law Dictionary (12th ed. 2024).

suspension connote a cessation or discontinuance of the relevant activity for a period of time.[129] By contrast, "delay," is defined as "[t]he act of postponing or slowing" and slowing is not ceasing.[130]

Given the plain meaning, a partial suspension amounts to a temporary interruption, postponement, or cessation of a more than nominal portion of a business's operations and a claimant must allege that a qualifying order caused a discrete, more than nominal, portion of its business to cease during the quarter at issue.[131] The Court need not resolve whether the ceased portion must be "meaningful," because Sevillo's allegations fail under either formulation. Indeed, every definition requires that what was delayed, interrupted, or terminated be a part of the employer's business.[132]

**2. What the Second Amended Complaint alleges**

Sevillo alleges delivery of the tomato products was "substantially delayed" as well as a "significant increase in its overall cost of goods sold," specifically in packaging supplies and

---

[129] *See I Health,* at *27.

[130] Delay, Black's Law Dictionary (12th ed. 2024); *see also I Health*, at *28.

[131] *See I Health*, at *27; *Sundancer Pools,* at *9-10 (defining 'partial suspension' as "a temporary interruption postponement, or cessation of a more than nominal portion of a business's operations" and a 'full suspension' as "a temporary interruption, postponement or cessation of all operations."); *accord In re JSmith,* 674 B.R. at 214 ("A 'partial suspension,' then is a temporary stoppage of a portion of operations.").Throughout the relevant case law, qualifying suspensions share a common form: a restaurant suspends in-person dining while continuing takeout and delivery; a retailer suspends on-premises shopping while continuing online sales; a construction company suspends in-office operations while continuing site work. In each case, a discrete line of business stops while the enterprise continued.

[132] *See Titan Mutual,* at *15 ("The plain and ordinary meaning of 'partial' as 'less than a whole' does not suggest an interpretation that would rise to the level of a 'meaningful portion.'").

freight, offsite storage, and direct supplies.[133] Sevillo further alleges it "was unable to operate at full capacity in manufacturing the products that required those ingredients and was unable to fill all orders from its customers" and was therefore "forced to cancel an unprecedented number of orders."[134]

Increased costs are not a suspension; rather, they indicate that operations continued at greater expense.[135] Delay is not cessation, and a reduction in capacity is not the cessation of a discrete portion of the business.[136] Here Sevillo is not subject to any order, yet Plaintiff pleads it could not operate at full capacity.

The allegations that come closest to referencing some type of suspension are Sevillo's claims that "[b]oth equipment and employees were idle and operations were suspended,"[137] that Plaintiff's "ability to provide its goods in the normal course of its business was reduced by ten percent or greater,"[138] and that its ability to fulfill customer orders "was reduced by ten percent or greater."[139] But the Second Amended Complaint does not identify which product line ceased,

---

[133] ECF No. 53 at ¶¶ 64, 65.

[134] *Id.* at ¶¶ 66, 67

[135] *Sundancer Pools*, at *16 (failing to link increased costs allegedly incurred to the suspension of business).

[136] *See I Health,* at *30 ("a reduction in onsite capacity is not necessarily a cessation of a discrete, more than nominal portion" of operations).

[137] ECF No. 53 at ¶ 66.

[138] *Id.*

[139] *Id.* at ¶ 67. At oral argument, Plaintiff further elaborated that its manufacturing lines were closed, equipment lines were not running and that there were products which Sevillo did not and could not make.

which equipment was idle, for how long any line was down, or in which quarter and Sevillo's allegations are insufficient to establish a full or partial suspension.[140]

**3. Sevillo's own allegations are irreconcilable with a suspension**

Sevillo alleges that products containing the Turkish treated tomato products accounted for approximately seventy-five percent (75%) of the products it sold and approximately seventy-five percent (75%) of its revenues.[141] It also alleges gross receipts for the quarter ending September 30, 2020 of $3,967,258.04, against $5,240,712.73 for the corresponding quarter of 2019—approximately seventy-six percent of prior-year receipts.[142] The figures for the fourth quarter of 2020—the lookback quarter on which Count Two's Gross Receipts Test allegations depend—are materially the same, at approximately seventy-five percent (75%) percent.[143] And Sevillo alleges that it retained approximately eighty-five (85) full-time employees throughout the quarters at issue.[144]

The question at this stage is plausibility, and plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[145] The Second Amended Complaint pleads that an input accounting for three-quarters of Sevillo's revenue became unavailable, and pleads in the same document that Sevillo earned roughly three-quarters of its prior-year receipts while retaining its entire workforce. It pleads no facts

---

[140] *See also Iqbal*, 556 U.S. at 678–79. Plaintiff's ten-percent (10%) allegations appear to track the ten-percent (10%) safe harbor of the Notice Q/A 11 and do not provide any supporting figure—no volume, no output, no comparison.

[141] ECF No. 53 at ¶¶ 11, 56.

[142] *Id.* at ¶¶ 43–44.

[143] *Id.* at ¶¶ 48–49.

[144] *Id.* at ¶ 13.

[145] *Iqbal*, 556 U.S. at 679.

reconciling the two. Absent that reconciliation, the assertion that the operation of the business was suspended does not cross the line from possible to plausible.

#### 4. "Constructive" suspension has no basis in the statute

Sevillo also alleges the statute "contemplates businesses that were constructively suspended through the widespread effects of lockdown orders and similar mandates."[146] But the word "constructively" appears nowhere in § 2301. Further, reading a constructive suspension into the statute would improperly expand the Suspension Test to any business that experienced pandemic-era economic difficulty.

## IV. LEAVE TO AMEND IS DENIED

In the alternative to dismissal, Sevillo requests leave to amend its complaint. While leave should be freely given when justice so requires, leave to amend should be denied where amendment would be futile.[147] "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal."[148] Amendment would be futile here.

The defects of Sevillo's claims are legal, not factual. The Court finds that the documents Plaintiff relies upon are not orders limiting commerce; a causal chain running from California workplace safety requirements through a third-party marine terminal and independent ocean carriers to a Utah manufacturer does not satisfy the term "due to" for purposes of causation; and the supply chain pathway requires a supplier whose own operations an order suspended. None of those holdings turns on the level of detail Plaintiff provides in its pleading.

---

[146] ECF No. 53 at ¶ 30.

[147] Fed. R. Civ. P. 15(a)(2).

[148] *Jefferson County School District v. Moody's Investor's Services,* 174 F.3d 848, 859 (10th Cir. 1999).

Sevillo previously amended in response to a specific roadmap provided by the Court in granting the United States' first motion to dismiss.[149] In that ruling, the Court identified four deficiencies and in response Sevillo has produced its best case.[150] There is no counterclaim here. Counts One and Two proceed on the Gross Receipts Test, so this decision terminates a theory not a case.

## V. CONCLUSION AND ORDER

Sevillo describes delayed deliveries, higher freight and storage costs, and an inability to operate at full capacity. While sympathetic to Sevillo's plight, what Plaintiff describes is an economic injury of the kind the Gross Receipts Test is designed to measure.[151] It is not a suspension of business operations due to an order limiting commerce.

The Court reaches this result on three independent grounds. First. no document identified by Sevillo qualifies as an order limiting commerce, travel, or group meetings. Second, the causal chain Sevillo pleads does not satisfy "due to" under either a proximate cause or a but-for standard. Third, the harm Sevillo describes is delay and reduced capacity, not the cessation of a discrete, more than nominal portion of its operations. Any of these three grounds requires dismissal of Sevillo's Second Amended Complaint for failure to state a claim.

---

[149] ECF No. 52.

[150] Although the *I Health v. United States* court allowed amendment, this case is distinguishable. 2026 U.S. Claims LEXIS 1858. *I Health* granted the plaintiff leave for three stated reasons, each of which is absent here: the governing decisions in that circuit issued after the operative complaint was filed; the court was following a defer-and-amend procedure adopted in an earlier case; and dismissal risked an outsized effect on a $400,000 government counterclaim. *Id.*

[151] Sevillo raises claims under the Gross Receipts Test for two of the three quarters at issue and those claims are still at issue.

Accordingly, IT IS HEREBY ORDERED that:

1. The United States' Request for Judicial Notice is GRANTED.[152]

2. The United States' Second Partial Motion to Dismiss is GRANTED.[153]

3. Count Three of the Second Amended Complaint is DISMISSED WITH PREJUDICE.

4. Plaintiff's claims in Counts One and Two are DISMISSED WITH PREJUDICE to the extent they rest on the theory that Plaintiff is an eligible employer because the operation of its trade or business was fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19).

5. Leave to amend is DENIED.

6. Counts One and Two remain pending solely as to Plaintiff's allegations that Plaintiff is an eligible employer under the Gross Receipts Test—CARES Act § 2301(c)(2)(A)(ii)(II) and (c)(2)(B) as to Count One, and § 2301(c)(2)(A)(ii)(II) as amended by the Relief Act as to Count Two.

7. The United States shall answer the remaining allegations of the Second Amended Complaint within thirty (30) days of the date of this Order and, within thirty (30) days thereafter, the parties shall meet and confer and submit a stipulated Scheduling Order.[154]

---

[152] ECF No. 54.

[153] *Id.*

[154] ECF No. 4, Order to Propose Schedule.

DATED this 28th day of September, 2026.

BY THE COURT:

______________________________
Dustin B. Pead
United States Magistrate Judge